The Salisbury Water Supply Company vs. Town
of Salisbury.

Essex.     April 6, 1960. — May 4, 1960.

Present: Wilkins, C.J., Spalding, Williams, Counihan, & Cutter, JJ.

*Municipal Corporations,* Contracts, Municipal finance.  *Contract,* Validity,
   With municipality, Water main extension.  *Salisbury.  Practice, Civil,*
   Auditor: recommittal.

There was no error in denial of a motion to recommit to an auditor for
   further findings when the additional facts sought were established by the
   record or by judicial notice or would be irrelevant.  [43–44]
This court took judicial notice of Sp. St. 1915, c. 243, incorporating The
   Salisbury Water Supply Company, and of the amendment thereof by
   St. 1935, c. 357.  [44]
A contract between The Salisbury Water Supply Company and the town
   of Salisbury providing that the company should make an extension of
   its system to serve a certain area in the town and that the town should
   pay the company annually a sum sufficient, with the operating revenue
   from the extension, to afford the company a net return of a stated per-
   centage of the cost of the extension, where the making of the contract
   was authorized by a vote of the town and it thereafter appropriated each
   year the amount of the required annual payment, was within the power
   of the town under Sp. St. 1915, c. 243, § 5, as amended by St. 1935,
   c. 357, was not precluded by G. L. c. 44, § 31, and was valid, even before
   the enactment of St. 1960, c. 276.  [45–48]

Contract.  Writ in the Superior Court dated July 31,
1957.

The action was referred to an auditor whose findings were
to be final.  A motion by the defendant to recommit to the
auditor was denied, and judgment for the plaintiff ordered,
by *Lurie,* J.  The defendant alleged exceptions.

*Louis A. Cyr,* Town Counsel, for the defendant.

*James W. Santry, Jr.,* for the plaintiff.

Cutter, J.  The plaintiff (the company) was organized
under Sp. St. 1915, c. 243, to supply water in Salisbury.
Its charter was amended by St. 1935, c. 357.  By the 1915
act and by the 1935 amendment, the company was author-

ized to "make . . . contracts with . . . [the] town." From December 21, 1949, to October 2, 1956, the company made nine contracts with the town to construct water line extensions to serve premises and hydrants on certain streets. The company installed these extensions at an aggregate cost of $91,292.85. Each contract in effect provided that the town would annually pay to the company a sum which, when added to the company's operating revenues from the particular extension, would provide the company with a net return of six per cent (after taxes, expenses, and one per cent per year for depreciation) of the actual cost of the extension.[1] The town through 1956 paid all amounts due under these contracts, except for a small balance due for the last six months of that year. The town appropriated each year through 1957, the most recent year here discussed, an amount sufficient to make the payments to the company under each contract. Recovery of the payments not made for the first six months of 1957 is sought in the first nine counts of the company's declaration. Another count deals with the unpaid 1956 balance.

An auditor, whose findings of fact were to be final, found for the company on all counts. The facts are stated upon the basis of his report. A motion to recommit his report for further findings was denied and a motion for judgment upon the auditor's report was allowed. The case is before us upon the town's exceptions to these actions.

1. It was not necessary to recommit the comprehensive auditor's report. One finding sought, with reference to the incorporation of the company as a privately owned water company, was established by the record. All the contracts

---

[1] The auditor, mentioned later in this opinion, found (a) this rate of return and (b) the expenditures made by the company for the several extensions to be fair and reasonable. Each contract contained a formula for computing the payment to be made each year. Water companies must keep accounts and make annual reports in a manner prescribed by the department of public utilities. G. L. c. 165, § 1, and § 2 (as amended through St. 1958, c. 527, § 2) incorporating by reference G. L. c. 164, §§ 80, 81, 83, 92, among other sections. See *Salisbury* v. *Salisbury Water Supply Co.* 279 Mass. 204, 207. Amendments made in three of the earlier contracts, apparently to make them all consistent, are not shown to have been beyond the authority of the selectmen under the relevant town votes or to have been to the disadvantage of the town.

and votes of the town are incorporated by reference in the auditor's report. We take judicial notice of the 1915 act incorporating the company and of its amendment in 1935, which are adequately referred to in the auditor's report. These statutes, by reason of the nature of the company's business, have general application throughout the town. See *DiMaggio* v. *Mystic Bldg. Wrecking Co.,* 340 Mass. 686, 689. For reasons stated below, it would be irrelevant if true, in our view of the case, that there has been no increase in water rates for 2,259 water users in the town since 1950,[2] and that, when certain of the contracts were made, there was no appropriation to cover expense for which the town was later to become liable under such contracts. Other findings sought by the motion to recommit have not been discussed in the town's brief.

2. A somewhat similar contract made by the town with a predecessor of the company (and assumed by the company under Sp. St. 1915, c. 243, § 9, see footnote 3, *infra*) was considered in *Salisbury* v. *Salisbury Water Supply Co.* 279 Mass. 204, 206–207. The predecessor company, Artesian Water Company, had agreed to extend its main (p. 205) "at such points as may be requested by the [t]own . . . where the total receipts of the extension from water takers and from the [t]own for . . . hydrants so put in shall afford to the [c]ompany six per cent. on the cost of laying and maintaining such additional pipes." The contract was for twenty years. In March, 1929, the town instructed (pp. 205–206) "the selectmen to require . . . [a particular] extension . . . and made an appropriation to cover its share of the cost," which as determined by the department of public utilities required a total annual gross income to be guaranteed in excess of the appropriation. The town sought specific performance of the contract after certain citizens had made application to the department to require the extension. This court held (p. 208) that, since

---

[2] By 1957, the annual payment of $12,109 due from the town under these contracts had become a significant part of the annual revenues of this small water company, which in 1957 had (figures to nearest dollar) operating revenues of $87,417, net operating income of $26,278, and a profit of $16,071.

the department had taken jurisdiction of the application (see G. L. c. 164, § 92, and c. 165, § 2), the Superior Court's jurisdiction of the bill in equity was "ousted." In discussing the contract (p. 207), however, the court said, "The town had authority to make a valid contract for a supply of water for fire protection and town purposes . . . and, at least after the recognition of the contract by Spec. St. 1915, c. 243[3] [the company's original charter], for supply for domestic and other uses by its inhabitants as individuals."

Special St. 1915, c. 243, § 5, then provided that the company "may make such contracts *with the . . . town . . .* or with any individual or corporation, to supply water for the extinguishment of fires *or for other purposes* as may be agreed upon . . . and may *contract with said town,* or with any individual or corporation, relative to the same" (emphasis supplied). With inconsequential changes, but with no indication (see 1935 Sen. Docs. 517, 542) of any substantive change in this grant of power to make contracts, § 5 was reënacted by St. 1935, c. 357.[4]

In the light of the earlier *Salisbury* case (279 Mass. 204, 207) we interpret the town's implied (if not express) authority to make contracts under § 5 of the amended 1915 statute as being at least as broad as to include contracts similar to the old contract recognized by § 9 of the 1915 act. There is no indication in the statute that the scope of the contracts contemplated by § 5 was to be any narrower than that of the contract specifically referred to in § 9 and referred to as valid in the earlier case. The 1915 and 1935 statutes are specific legislation consistent with, but not dependent upon, more general legislative grants to towns of power to make contracts. See G. L. c. 40, §.38, as amended

---

[3] Special St. 1915, c. 243, § 9, provided that the company "shall have the authority to . . . purchase the . . . rights and privileges of . . . Artesian Water Company . . . and upon such purchase shall assume . . . the contract between . . . [the] town . . . and said . . . [c]ompany for supplying the inhabitants . . . with water."

[4] The amendment apparently was designed to provide greater rate supervision of the company by the department of public utilities with respect to the company's distribution of water and its system of sewage disposal, a matter on which the company was also authorized to contract with the town by the 1915 and 1935 statutes.

through St. 1941, c. 465, § 1. See also c. 40, § 4 (as amended, from time to time during the period of the contracts here discussed) ; c. 41, § 21 (as amended through St. 1953, c. 101, § 2). See as to the power of towns to make appropriations for the purpose of obtaining water, G. L. c. 40, § 5, esp. cl. (5A), inserted by St. 1938, c. 172, § 1. A more explicit grant of authority to a town to make contracts with a water company was discussed in *Oak Bluffs* v. *Cottage City Water Co.* 235 Mass. 18, 21. See *Smith* v. *Dedham,* 144 Mass. 177, 179–180. See also *White* v. *Treasurer of Wayland,* 273 Mass. 468, 471. The town, of course, could not itself have directly supplied the area served by the extensions with water from any source other than that of the company while the company continued to serve the town. See G. L. c. 40, § 39A (as amended through St. 1941, c. 465, § 2).

The town contends that the contracts were invalid because of G. L. c. 44, § 31, as amended through St. 1955, c. 259.[5] The pertinent provisions of § 31 were in effect even prior to 1915, when the contract considered in the earlier *Salisbury* case was made, and before 1929 when the incidents considered in that case took place. The contract considered in *Oak Bluffs* v. *Cottage City Water Co.* 235 Mass. 18, 20, was made before St. 1913, c. 719, § 16 (see footnote 5, *supra*). In neither decision is there suggestion that the validity of such a contract was in any degree affected by § 31. Such town contracts to induce local public utilities to provide facilities for services to be furnished to the town and its inhabitants, where the services are to be paid for in

[5] Section 31, as so amended, reads: *"No department* financed . . . in whole or in part by taxation, *of any . . . town . . . shall incur a liability in excess of the appropriation made for the use of such department,* each item . . . voted by the town meeting . . . being considered as a separate appropriation, *except in cases of extreme emergency involving the health or safety of persons or property, and then only . . . in a town by a* majority *vote of* all *the selectmen. . . ."* The italicized words appeared in the original form of this statute, St. 1913, c. 719, § 16, and also in the 1921 edition of the General Laws, but, prior to St. 1955, c. 259, "a vote of two thirds of the selectmen" was required for the incurring of an emergency liability. The contracts here discussed, of course, do not rest upon any power given by § 31 to make emergency contracts. If the framers of the original section had in mind contracts like the one here considered, it is not apparent from the legislative history. See Report of the Joint Special Committee on Municipal Finance, 1913 House Doc. 1803, pp. 9–10, 74 (§ 16).

part by the town currently from year to year, at least since *Smith* v. *Dedham,* 144 Mass. 177, may be regarded as within the express or implied contracting powers of towns. In *Smith* v. *Dedham* (at p. 180) it was stated that "the town . . . could legally make provision for a supply of water to the town for fire purposes. Having this power, the first fifteen sections of the Pub. Sts. c. 29 [relating to town indebtedness], would not exempt it from its liability to pay debts contracted for the supply of water to the town . . . . The contract which the selectmen are authorized to make is one which we assume is for a sum of money to be paid annually, among the other current expenses of the town. The payments are to be made out of the moneys annually granted by the town and raised by taxation. It is, in effect, a cash transaction, where the payments are made pari passu with the accumulation of the yearly service which determines the amount to be paid." See *Walla Walla* v. *Walla Walla Water Co.* 172 U. S. 1, 20; McQuillin, Municipal Corporations (3d ed.) §§ 39.63, 39.64, 41.37, 41.38; Annotation 103 A. L. R. 1160. Cf. *G. M. Bryne Co.* v. *Barnstable,* 286 Mass. 544, 552–554. It may be that a town could obtain, directly or indirectly, some such extensions of utility service, as in the earlier *Salisbury* case, by application to the department of public utilities under G. L. c. 164, § 92; c. 165, § 2, as amended. Nevertheless, some new territories might be so potentially unproductive as to make it uncertain whether the department would order an extension, except upon terms and at prohibitive rates. In such cases there may be strong practical reasons for a town to make such a contract. It would probably be difficult for a town to negotiate a contract for this type of utility extension unless it were to run for a period of years. Many of the same practical reasons for holding that such contracts do not create debts within statutory town debt limitations would lead to treating them as not invalid under § 31, in the absence of a statute showing a clear legislative intention that they should not be made.

It would have been possible for the Legislature at some

time to have inserted in G. L. c. 40, § 4, an express provision authorizing towns to make contracts with water companies for a stated number of years as was done by St. 1946, c. 358, § 1, with respect to contracts for "lighting public highways and public grounds." As to this the Joint Committee on Municipal Finance said, see 1946 House Doc. 1590, p. 7, "Examining chapter 40 of the General Laws we find that section 4 enumerates the purposes for which a town . . . may contract. . . . [T]owns have been for years entering into contracts for street lighting with privately operated electric companies for periods running up to ten years, and the practice has become so common that no one has ever seemed to question the authority of a . . . town to do it. From the viewpoint of a . . . town such contracts are desirable. The private company which provides this service should be guaranteed a return over a period of years in order to justify the investment necessitated by the service. The [c]ommittee, therefore, recommends that section 4 . . . be amended by adding thereto the following: For lighting public highways and public grounds for a period not exceeding ten years." That there is in § 4, in addition to the general language at the beginning of the section, no specific authorization of contracts with water companies for a term of years does not indicate to us that no power exists to make such contracts. In the absence of any explicit later legislative prohibition of such contracts, we view them as recognized in *Smith* v. *Dedham,* and in the earlier *Salisbury* case as within town authority.[6]

The auditor states that it was "agreed by the parties . . . that after the initial vote authorizing a particular installation and the appropriations contained therein [usually for one year's estimated payment under the contract], . . . at each annual town meeting subsequent to the installation . . . a sufficient appropriation was made to pay the plaintiff under the terms of each contract. This procedure

---

[6] The problem presented by the present case is not likely to recur in view of the enactment of St. 1960, c. 276, inserting in Sp. St. 1915, c. 243, a new section (§ 5A) making special provision for the extension of pipe lines and related facilities in Salisbury.

was followed each year through 1957.'' There is no re-
quirement under such a contract that the whole expense, for
all the years in which service is to be provided by the com-
pany, be appropriated at the inception of the contract. See
*Clarke* v. *Fall River,* 219 Mass. 580, 585–586; *Wilson* v.
*Brouder,* 291 Mass. 389, 393. See also *Smith* v. *Dedham,*
144 Mass. 177, 180; *Marble* v. *Clinton,* 298 Mass. 87, 88–89.

If the town is now dissatisfied with the terms of the con-
tracts, it may have various remedies (as, for example, seek-
ing an upward revision of the rates charged by the company
to its customers, so as to reduce the amount to be paid to
the company by the town) under the general provisions of
the statutes providing for the regulation of water com-
panies. See e.g. G. L. c. 165, § 2, and sections of c. 164,
especially § 93, incorporated in c. 165 by reference; Sp. St.
1915, c. 243, § 10. With these remedies, we are not now
concerned.

There is no merit to the town's contention that the votes
of the town did not give the selectmen authority to enter
into these contracts. Nothing in the contracts has been
shown to have exceeded the general authority given to the
selectmen by a long series of votes in each of the years 1949,
1950, 1952, 1953, 1954, 1955. The votes were sufficient.
They are not to be construed with technical strictness and
every presumption is to be made in their favor. See *Caires*
v. *Building Commr. of Hingham,* 323 Mass. 589, 597.

Other contentions argued by the town in its brief have
been considered. They are without merit.

*Exceptions overruled.*