## JAMES G. TIBERIO & others *vs.* TOWN OF METHUEN

Essex.    December 6, 1973.—February 12, 1974.

Present:  TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & WILKINS, JJ.

*Constitutional Law,* Home Rule Amendment, Municipality. *Municipal Corporations,* "Home Rule." *Election.*

In a suit in equity challenging the validity of a vote by which a town purported to adopt a home rule charter under the Home Rule Procedures Act, G. L. c. 43B, the plaintiffs had the burden of establishing that one or more procedural errors or omissions had a material and substantial effect on the adoption of the charter. [580-581]

There is no inconsistency between the provisions of the Home Rule Amendment, art. 89 of the Articles of Amendment to the Constitution of the Commonwealth, and the requirements of G. L. c. 43B, § 11, concerning distribution of copies of the final report of a charter commission. [581-582]

On the evidence in a suit in equity challenging the validity of a town vote adopting a home rule charter, although the process for distribution of the final report of the charter commission was not perfect, the procedural errors in the distribution process were not shown to have "materially and substantially affected" the vote adopting the home rule charter within G. L. c. 43B, § 14 (3). [582-583]

In a suit in equity challenging the validity of a town vote adopting a home rule charter, although the identity of a donor of $100 to the charter commission was not disclosed either on acceptance of his contribution or in the commission's account of its finances, contrary to G. L. c. 43B, §8 (a), those omissions did not furnish a basis for invalidating the result of the town's vote where they were not shown to have materially and substantially affected the adoption of the charter. [584-585]

In a suit in equity challenging the validity of a town vote adopting a home rule charter, although the charter commission violated G. L. c. 43B, § 8 (a), by failing, in the account of its receipts and expenditures, to indicate the disposition of funds made available to it by the town, such failure did not furnish a basis for invalidating the vote where it was not shown that the failure had any effect on the vote. [585-586]

The summary of a home rule charter which appeared on the ballot at a town election with a question as to adoption of the charter was adequate and complied with the requirements of G. L. c. 43B, § 11. [586-587]

In a suit in equity challenging the validity of a town vote adopting a home rule charter, it was held that two statements in the conclusion of the charter commission's final report concerning the matter of job security for present town officials and employees and the period of time which

Tiberio *v.* Methuen.

would be required to amend the charter once adopted fell within the area of comment permitted by G. L. c. 43B, § 9 (c) [587-588]; that an omission from the printed final report of a portion of the proposed charter and failure of the selectmen and the charter commission to advise the voters of the error before the election were not shown to be a material and substantial procedural defect where the omission related to a minor aspect of the charter and the substance of the omitted words might fairly have been inferred [588]; and that a proposed charter provision that the school committee might "have such additional powers and duties as the town council . . . [might] by ordinance from time to time assign" did not constitute a "major" difference "between the current and proposed charters" required by G. L. c. 43B, § 9 (c), to be indicated in the charter commission's final report [588-589].

BILL IN EQUITY filed in the Superior Court on April 4, 1972.

The suit was heard by *Cahill,* J., on a master's report.

*George Karelitz* for the plaintiffs.

*Robert D. Smith* (*John T. Sweeney & Michael P. Curran* with him) for the defendant.

WILKINS, J. The plaintiffs constitute more than ten registered voters of the town of Methuen (town). They appeal from a final decree dismissing their bill in equity which challenged the validity of a vote by which the town purported to adopt a home rule charter under the Home Rule Procedures Act (G. L. c. 43B, inserted by St. 1966, c. 734, § 1).

In March, 1971, the voters of the town voted to frame a charter and a charter commission was elected. The charter commission filed its final report on January 3, 1972. At a town election held on March 6, 1972, the voters of the town approved the home rule charter proposed by the charter commission.[1] This bill in equity was filed within thirty days after the election.[2] The case was referred to a master whose

[1] Of the 18,804 persons eligible to vote at the March 6, 1972, election, 9,785 cast ballots. On the charter question 4,959 voted "yes"; 4,128 voted "no"; and there were 698 blanks. We were advised at oral argument that the town has been operating under the new home rule charter, which according to its terms became fully effective on January 1, 1973.

[2] Any judicial challenge "to determine the validity of the procedures whereby any charter is adopted" must be filed within thirty days after the election. In the absence of such a petition, "compliance with all the procedures required by . . . [G. L. c. 43B] and the validity of the manner in which such charter . . . was approved shall be conclusively presumed." G. L. c. 43B, § 14 (3).

report has been confirmed. The plaintiffs contend that on the basis of the master's report the decree dismissing their bill should be reversed and that a final decree should be entered declaring that the purported adoption of the Methuen home rule charter was invalid and null and void.

The plaintiffs base their challenge on asserted violations of several of those provisions of G. L. c. 43B which set forth procedures to be followed in the adoption of a home rule charter. They claim that (1) the final report of the charter commission was not "distributed to each residence of one or more registered voters" as required by G. L. c. 43B, § 11; (2) the charter commission failed to file a proper account of its receipts and expenditures "[w]ithin thirty days after submission of its final report," as required by G. L. c. 43B, § 8 (a); (3) the summary of the provisions of the charter which appeared on the ballot was insufficient to satisfy the requirements of G. L. c. 43B, § 11; and (4) the final report of the charter commission was defective in certain material respects. Before analyzing each of these claims in light of the facts found by the master, attention should be given to the standard which is applicable in testing the effect to be given to any established violation of the procedural requirements of the Home Rule Procedures Act.

Section 14 (3) of G. L. c. 43B provides, in part, that "[n]o charter adoption . . . shall be deemed invalid on account of any procedural error or omission *unless it is shown that the error or omission materially and substantially affected such adoption*" (emphasis supplied). The master made no finding concerning the possible effect on the vote of the town of any of the asserted procedural violations. There is no indication in his report that any registered voter did not vote because of any claimed procedural defect or that any registered voter who voted in the affirmative would have voted differently if any one or more of the alleged procedural defects had not occurred. The plaintiffs, of course, have the burden of establishing that one or more procedural errors or omissions had a material and substantial effect on the adoption of the Methuen home rule charter. They argue that the facts found

by the master show such a material and substantial effect. The determination of such a question depends, of course, on the facts of each case. We believe that the Legislature intended that a vote approving the adoption of a home rule charter should be invalidated only if it seems reasonably likely that the result of the vote would have been different if the procedural error or errors had not occurred.

We turn then to an analysis of the procedural defects asserted by the plaintiffs to determine in each instance whether there was a violation of the requirements of the Home Rule Procedures Act and, if there was such a violation, whether the plaintiffs have shown that the violation, or the violations taken collectively, "materially and substantially affected" the vote to adopt the charter.

1. The plaintiffs argue that the board of selectmen failed to distribute a copy of the final report of the charter commission "to each residence of one or more registered voters" as required by G. L. c. 43B, § 11. It is clear from the master's findings, which are summarized in this respect below, that the residences of some registered voters were missed.

The town argues first in response to this contention that the delivery requirement of § 11 is unconstitutional because it imposes a standard which is not permitted under the Home Rule Amendment. See art. 89 of the Amendments to the Constitution of the Commonwealth, annulling art. 2 of those Amendments and adopting what is commonly called the Home Rule Amendment. We do not agree. Section 1 of art. 89 permits the General Court to establish standards and requirements in accordance with the provisions of art. 89. Section 8 of art. 89 in turn provides that the General Court has the power to act in relation to cities and towns by general laws which apply to all cities and towns (or to all cities, or to all towns, or to a class of not fewer than two). "The Home Rule Procedures Act [G. L. c. 43B] is a general law itself" (*Bloom* v. *Worcester,* 363 Mass. 136, 145-146 [1973]), binding on all municipalities. There is no inconsistency between the provisions of the Home Rule Amendment and the requirements of G. L. c. 43B concerning distribution of copies

of the final report of the charter commission.

The facts found by the master concerning the distribution of the final report of the charter commission can be briefly summarized. The selectmen contracted with a mailing service for the preparation of an envelope addressed to each residence in the town. A list of residential addresses, "updated" in October, 1971, was furnished by the Methuen post office. There were 10,480 envelopes made out, 9,133 envelopes addressed to "Resident" with the street address and town and 1,347 envelopes addressed to "Postal Patron Local" for delivery by rural route carriers to each mailbox. "No envelopes were prepared for nursing homes, rooming houses, college dormitories, businesses, hospitals and rest homes." A total of 356 copies of the report were delivered by hand to nursing homes and hospitals. The master found that some residences were obviously missed. He found that "there are more than 11,000 residences in the Town and a lesser number [of reports] were distributed by mail and delivery." Some reports were distributed on request at the town hall. The report and proposed vote were well publicized in the local press as news items and advertisements. Of the 13,000 reports printed, some were left over. No attempt was made to ascertain the identity of new residents of the town, and there were some, although it is not clear that any person newly resident in the town since the mailing list was prepared was a registered voter. The residences of at least twenty-five newly registered voters living in new homes in the town were not on the mailing list. Only three envelopes were prepared for delivery to one apartment house which contained twenty-four units.

In analyzing the plaintiffs' argument it should first be noted that § 11 of G. L. c. 43B requires distribution "to each residence of one or more registered voters" and not delivery to each registered voter. Compare art. 48, General Provisions, IV, as amended by art. 74, § 4, of the Amendments to the Constitution, requiring the Secretary of the Commonwealth to send "to each registered voter" the full text of every initiative measure to be submitted to the people. The

selectmen were, therefore, correct in their determination to distribute one report to each residence in the town, regardless of the number of voters residing at that residence.

Clearly the distribution process was less than perfect. Certainly new homes occupied after the mailing list was prepared (approximately five months earlier) were missed, and there were registered voters in at least some of those homes. Some places such as rooming houses, college dormitories and rest homes were completely missed. There is no finding as to how many registered voters resided in such places. We believe, however, that the informational purpose of the distribution requirement of § 11 was substantially achieved. More importantly, we believe that the procedural errors in the distribution process have not been shown to have "materially and substantially affected" the vote adopting the home rule charter. G. L. c. 43B, § 14 (3).

2. The plaintiffs contend next that the charter commission failed to file with the town clerk "a complete account of all its receipts and expenditures for public inspection" within thirty days after submission of its final report. G. L. c. 43B, § 8 (a).[3] Under § 8 (a) a required financial account should have been filed within thirty days of January 3, 1972, the date the final report was submitted. No account was filed, however, until the day after this bill in equity was entered. Had it been seasonably filed, any information disclosed by the account, including the name and address of any person or agency making a contribution and the amount and purpose of the contribution, would have been available to the voters at the time of the March 6 vote.

---

[3]The relevant portion of G. L. c. 43B, § 8 (a), reads as follows: "In addition to funds made available by a city or town the charter commission account may receive funds from any other source, public or private, provided, however, that no contribution of more than five dollars shall be accepted from any source other than the city or town unless the name and address of the person or agency making the contribution, the amount of the contribution and the conditions or stipulations as to its receipt or use, if any, are disclosed in a writing filed with the city or town clerk. The consent of a charter commission to any such condition or stipulation shall not be binding upon a city or town. Within thirty days after submission of its final report the charter commission shall file with the city or town clerk a complete account of all its receipts and expenditures for public inspection. Any balance remaining in its account shall be credited to the city's or town's surplus revenue account."

Tiberio *v*. Methuen.

A review of the financial account of the charter commission, which was incorporated in the master's report, discloses the receipt of approximately $896 between the middle of February and early March, 1972, including $500 from the Methuen Board of Trade, $150 from the chairman of the charter commission and the balance in eighteen gifts from individuals and organizations. The commission expended these funds largely for radio and newspaper advertisements and for the printing of flyers. All expenditures were made by checks drawn on a checking account maintained by the charter commission and were dated in late February through early April.[4] No report was made by the charter commission of the disposition of funds made available to it by the town.

We note that, based on the financial account, all receipts and expenditures of funds contributed to the charter commission occurred more than thirty days after the submission of its final report. A financial account filed within thirty days of the final report of the charter commission would, therefore, have disclosed no receipts and no expenditures (except as to funds made available by the town). Thus if a report, at least an interim report, had been seasonably filed, it is unlikely that the result of the election would have been affected in the slightest degree by the disclosures which would have been made in such a report.

It is clear, however, that the charter commission did not comply with the requirements of G. L. c. 43B, § 8 (a), with respect to its financial accounting. The master found that the report of receipts and expenditures "failed to identify each donor who contributed $5.00 or more." This conclusion was based on testimony of the chairman of the charter commission that $100 of the $150 reported as contributed by him was in fact a donation, without condition, from a person who requested that he not be identified. The chairman of the

---

[4]The plaintiffs do not contend that the town's vote should be set aside because gifts to the charter commission were kept in a private checking account rather than in the account of the charter commission maintained by the town. The receipt and holding of contributions to a charter commission in the municipal account is permitted, if not required, under G. L. c. 43B, § 8 (a).

charter commission declined to identify the anonymous donor at the hearing before the master. Such a concealment of the name of the donor was clearly not appropriate under the provisions of § 8 (a). In fact, quite apart from the complete account which should have been filed by the charter commission, no amount in excess of $5 should have been "accepted from any source other than the . . . town unless the name and address of the person or agency making the contribution, the amount of the contribution and the conditions or stipulations as to its receipt or use, if any, . . . [were] disclosed in a writing filed with the . . . town clerk." G. L. c. 43B, § 8 (a). It is not at all clear that the plaintiffs are contending that this separate disclosure requirement concerning gifts was not met. However, even if the unknown donor's name was disclosed neither on acceptance of his contribution nor in the account of the finances of the charter commission, these omissions do not furnish a basis for invalidating the result of the town's vote. They are not shown to have materially and substantially affected the adoption of the home rule charter.

The charter commission's account of its receipts and expenditures did not indicate the disposition of funds appropriated or otherwise made available to it by the town. The account dealt solely with the expenditure of gifts received by the charter commission. We believe that the financial account of the charter commission should have disclosed funds made available to it by the town and the disposition of these funds. Although funds made available by a municipality and held in a municipal account in the name of a charter commission are not "receipts" in the normal sense, a charter commission could not make "a complete account of all its receipts and expenditures" (§ 8 [a]) unless the disposition of funds made available by the municipality was set forth in the report. There is, however, no showing of any impropriety with respect to the disposition of the funds made available by the town. These funds were held in the town treasury, expended on direction of the charter commission and paid out by the town treasurer on approval of the selectmen "in the

same manner every town bill was paid." The amount appropriated by the town for the charter commission in prior years was a matter of public record (see G. L. c. 41, § 15, requiring the town clerk to record all votes passed at town meetings; G. L. c. 66, § 10, allowing inspection of "public records"; and G. L. c. 4, § 7, Twenty-sixth, defining "public records"). The public funds expended by the charter commission during 1971 and the recipients of those funds were disclosed before the master by an exhibit prepared by the town treasurer. We note that $7,500 was expended in 1971 for professional municipal consulting services, about $1,450 for legal notices and about $100 for miscellaneous small items. We see no basis on which to conclude that the failure of the charter commission to report on the appropriation and disbursement of funds provided by the town had any effect on the vote.

3. The plaintiffs argue that the summary of the charter which appeared on the ballot was "misleading, inadequate, and untrue." Section 11 of G. L. c. 43B provides that "[w]here a new charter . . . is being submitted at an election, set forth here [i.e. right after the ballot question] a brief summary of its basic provisions (composition and mode of selection of the legislative and executive branches and school committee or, if a change of none of these is involved, the most significant proposed change)." The ballot summary, which with the ballot question is set forth in full in the margin,[5] dealt with the composition and mode of selection of the new town council, a town administrator and the school committee.

---

[5] "'SHALL THIS TOWN APPROVE THE NEW CHARTER RECOMMENDED BY THE CHARTER COMMISSION, SUMMARIZED BELOW?'

SUMMARY

The proposed charter would provide for (1) a legislative body comprised of 21 members, 2 to be elected from each of 9 precincts and 3 to be elected at large, to serve non-concurrent terms of 2 and 3 years each, respectively; (2) a town administrator, appointed by the legislative body, to serve at their pleasure, who would be the administrative head of the town; (3) the school committee would remain at 7 members, elected at large, with the same terms of office as in the past.''

| YES | . |
| --- | --- |
| NO | |

Section 11 does not intend that the ballot summary be a full description of the new charter or even of all of its significant provisions. The statute requires only that the ballot summary set forth the composition and the method of selection of the principal town officials where, as here, a change as to any of those officials is proposed. When no such change is proposed, then only "the most significant proposed change" must be set forth. Various substantive changes in the system of town government which the plaintiffs claim should have been recited did not have to be set forth in the summary and, if they all had been, the statutory requirement of a "brief summary" would not have been met. The brief summary called for in § 11 is obviously designed to identify for the voter the general subject on which he is asked to express an opinion. We hold that there was no error in the ballot summary.

The statutory requirement of a brief summary involved here is less stringent than the constitutional requirement that the State ballot contain "a fair, concise summary" of any initiative measure submitted to the voters under art. 74 of the Amendments to the Constitution of the Commonwealth. See *Sears* v. *Treasurer and Recr. Gen.* 327 Mass. 310, 324 (1951); *Opinion of the Justices,* 357 Mass. 787, 799-800 (1970).

4. The plaintiff's claim that the final report of the charter commission was materially defective is based on asserted errors in the inclusion and exclusion of material. They object to the inclusion of two statements in the conclusion of the charter commission's final report. These statements, which are set forth in full in the margin, are expressions of opinion concerning (a) the matter of job security for present town officials and employees and (b) the period of time which would be required to amend the charter once adopted.[6] Section 9 (c) of G. L. c. 43B, as amended through St. 1971,

---

[6]The sentence concerning town officials and employees to which the plaintiffs object appears in a paragraph laudatory of "the many members of the town government family" and reads as follows: "There is no reason for any of our fine town officers or employees to feel that their position will in any way be jeopardized by the changes which will be made."

The statement concerning charter amendments appears in a paragraph pointing out that although the members of the charter commission were not unanimous on

c. 37, § 1, provides that the final report of the charter commission may include "such comments as the commission deems desirable." The statements to which the plaintiffs object plainly fall within the area of permissible comment.

The plaintiffs complain that the printed final report of the charter commission omitted a portion of the proposed charter as submitted to the selectmen. The printer left out twenty-five words which described circumstances relating to a special election to select members of the new town council.[7] The selectmen knew of the omission before the report was distributed but they took no action to notify the voters of this omission.

The omission was unfortunate. The failure of the selectmen and the charter commission to advise the voters of the error before the March 6 election is also unfortunate. However, the omission related to a minor aspect of the charter. The substance of the omitted words concerning the application of charter provisions to the special election might fairly have been inferred. There is no statement elsewhere in the charter implying that incumbent officeholders could not be candidates for election at the special election, and common sense and fairness suggest that they could be candidates. We thus conclude that the omission, although clearly a defect, was not shown to be a material and substantial procedural defect.

The plaintiffs finally contend that the "indication of the major differences between the current and proposed charters," which was required to be included in the commission's final report (see G. L. c. 43B, § 9 [c]) was defective

---

every provision contained in the charter, they were unanimous that "as a whole it should be adopted and made effective." That paragraph concludes with the sentence to which the plaintiffs object. It reads: "If it is later found that there are provisions which should be changed, there are procedures available to accomplish such changes without undue delay."

[7]The omitted words are set forth in italics in the following excerpt from the charter as submitted to the selectmen: "All of the provisions of the charter which relate to the conduct of regular town elections including a preliminary election *shall apply to this special election. Any incumbent official of the town may be a candidate for any office to be filled at this election.*"

because it made no reference to a charter provision that the school committee "may have such additional powers and *duties as the town council may by ordinance from time to time assign"* (emphasis supplied). The plaintiffs base their contention on the assertion that it would be contrary to the laws of the Commonwealth to increase the powers or duties of a school committee by a local ordinance.[8]

The only issue before us is whether the final report of the charter commission should have referred to this provision concerning the school committee among the stated major changes proposed by the new charter, and, if it should have, whether the failure to indicate this difference has been shown to have materially and substantially affected the adoption of the charter. Accepting the plaintiffs' argument that this charter proposal somehow represented a change in the legislative power of the town, we do not regard the difference as a major difference which had to be indicated in the commission's report. There were many other items of greater importance.

5. We have considered the likely collective effect on the result of the town's vote of the procedural errors or defects described in this opinion and conclude that the plaintiffs have not proved that the result of the vote would have been different if those errors or defects had not occurred. The decree dismissing the bill is affirmed.

What we have decided should not, however, be construed as an invitation to lax compliance with the procedural requirements of the Home Rule Procedures Act. Since the entry of this bill in equity the town has been operating under a shadow of uncertainty as to the validity of action taken under its new home rule charter. Careful attention to the requirements of the Home Rule Procedures Act would have avoided that uncertainty.

*Decree affirmed.*

---

[8]We have no ordinance, or even proposed ordinance, before us. The validity of any such ordinance may appropriately be raised for judicial determination at a later date. See G. L. c. 43B, § 14 (2); *Bloom* v. *Worcester,* 363 Mass. 136 (1973).