BOARD OF HEALTH OF NORTH ADAMS *vs.* MAYOR OF NORTH
ADAMS & another
(and a companion case between the same parties).

Berkshire.   May 6, 1975. — September 5, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Municipal Corporations,* Water supply, Fluoridation, Municipal finance. *Water. Elections. Constitutional Law,* Public health, "Home Rule Amendment." *General Court,* Power over municipality. *Equity Pleading and Practice,* Decree. *Words,* "Order."

An order of a board of health that the city "augment the fluoride content of the city's water supply to the optimum of 1.0 parts/ million recommended by the State Department of [Public] Health" was effective under the publication provisions of G. L. c. 111, § 8C, as appearing in St. 1968, c. 548, where the order was fol-

lowed by a newspaper notice that the board had "ordered that an upward adjustment to the optimum level . . . be made" to the fluoride content. [560]

The expression in G. L. c. 111, § 8C, as appearing in St. 1968, c. 548, that the provisions of § 8C shall not apply "if two or more cities or towns are supplied water from the same source" refers to a case where two or more municipalities share a common water supply, not to a case where one municipality undertakes to provide water from its own supply to users in other municipalities. [560-561]

A question on the ballot at a city election in the words prescribed by G. L. c. 111, § 8C, as appearing in St. 1968, c. 548, "Shall the fluoridation of the public water supply for domestic use in . . . [the city] be continued?" was not unconstitutionally misleading even though physical fluoridation had not begun at the time of the vote. [561-564]

Under G. L. c. 111, § 8C, as appearing in St. 1968, c. 548, placing the initiative for fluoridation of public water supplies in the State Department of Public Health, and providing that on State recommendation local boards of health may "order" the upward adjustment of the fluoridate content of water supplies, the board of health of a city, in furtherance of such an order, had power to compel the city council to appropriate money to implement the order; exercise of the power was not precluded by any provision of art. 89 of the Amendments to the Massachusetts Constitution or by G. L. c. 44, § 31. [564-568] QUIRICO, J., dissenting as to G. L. c. 44, § 31.

In a suit in equity for declaratory relief by the board of health of a city against its city council, the final decree should have merely declared the rights of the parties and not have ordered the council to provide funds necessary to implement an order of the board. [568]

TWO BILLS IN EQUITY filed in the Superior Court on October 3, 1972.

The suits were heard by *Hayer,* J., on a case stated.

The Supreme Judicial Court granted a request for direct appellate review.

*James A. Bowes* for the defendants.

*Bernard Lenhoff* (*John Lenhoff* with him) for the plaintiffs.

*Herbert H. Hershfang,* for the Massachusetts Dental Society, amicus curiae, submitted a brief.

KAPLAN, J. The board of health of North Adams (board) sought by the present action to require the mayor and city council of North Adams to make available funds to study, and later to accomplish, the fluoridation of the city's water supply in accordance with the board's order issued on the recommendation of the State Department of Public Health. On a bill for declaratory relief, the case was submitted to the Superior Court as a case stated, and the board prevailed. At the same time the Superior Court dismissed the board's companion bill in equity, on the same case stated, as being unnecessary. The defendants appealed from the decree against them, and the board filed a pro forma appeal from the dismissal. The matters were consolidated and we allowed direct appellate review pursuant to G. L. c. 211A, § 10 (A).

In their attack on the judgment, the defendants argue (1) that the board's order was defective because it did not comply with the requirements of G. L. c. 111, § 8C, the basic statute governing water fluoridation in this State; (2) that the wording of the question put in a referendum held under the statute, following issuance of the board's order, was misleading and thereby deprived voters of due process; and (3) that in any event the board of health cannot compel the city council to appropriate funds.

We first summarize the background and purport of G. L. c. 111, § 8C.

Until 1958, there was no general State statute governing fluoridation. The usual language of the acts passed by the General Court to enable cities and towns to provide for the supply of water to their inhabitants gave the localities sufficient authority to fluoridate if the State Department of Public Health approved. See Rep. A. G., Pub. Doc. No. 12, 1953, pp. 33-34.

In 1958, a restriction was imposed. By St. 1958, c. 254, codified at G. L. c. 40, § 41B, no locality could fluoridate unless "the will of the voters . . . is first ascertained." That will could be ascertained by action of the local board of water commissioners placing on the

ballot the question, "Shall the public water supply for domestic use in (this city) (this town) . . . be fluoridated?" The public vote, however, was purely advisory. See *Scott* v. *Election Commrs. of Newton,* 346 Mass. 388, 391 (1963).

By St. 1962, c. 485, § 1, amending G. L. c. 40, § 41B, the advisory public vote above mentioned could only be taken if a petition requesting the vote was signed by five per cent of the voters of the locality. (The same legislation added § 41C, permitting a similar advisory ascertainment of the public will as to the discontinuance of fluoridation on petition by five per cent of the voters.) The requirement of the petition appears to have had the effect of reducing sharply the rate of adoptions of fluoridation by localities.[1]

Resolves 1966, c. 66, reflected dissatisfaction with the condition of dental health in the Commonwealth and established a special study commission. The report of the commission (1968 House Doc. No. 3902)[2] strongly supported fluoridation of water as a means of reducing the incidence of tooth decay. The report specifically recommended "[t]hat sections 41B and 41C of chapter 40 of the General Laws be repealed and that instead water fluoridation be instituted at the discretion and recommendation of the State Commissioner of Public Health with the concurrence of the local board of health." *Id.* at 22. The draft bill submitted by the commission to carry out this proposal stated: "If the commissioner determines that the fluoride content of the public water supply . . . in any city, town or district is not at optimum level for sound dental health, he shall so notify the local boards of health . . . . Each such board of health . . . shall, if it

---

[1] See the brief submitted in the present case by the Massachusetts Dental Society, as amicus curiae, at pp. 20-21.

[2] Report of the Special Commission on the Condition of Dental Health and of Measures to Eliminate Dental Decay Including Fluoridation of Community Water Supplies.

considers doing so in the best interests of the inhabitants . . . order the upward adjustment of the fluoride content . . .."

This draft bill was the basis of the legislation enacted, St. 1968, c. 548, codified at G. L. c. 111, § 8C. Two material additions to the draft appeared in § 8C. First, fluoridation was not to occur where two or more localities were supplied from the same source if independent treatment of the water supply of one locality was not possible and "the majority of the boards of health representing such cities and towns have voted not to accept . . . [the State commissioner's] recommendation." Second, a procedure was provided for countermanding the order of the board of health by means of a popular vote. An order did not become effective until publication in a local newspaper, and opponents of fluoridation had ninety days following the publication to collect the signatures of ten per cent of the registered voters on a petition requesting that there be placed on the ballot at the next regular city or town election the question, "Shall the fluoridation of the public water supply for domestic use in (this city) (this town) be continued?" If a majority voted no, fluoridation was to be discontinued. (By the same legislation, G. L. c. 40, §§ 41B-41C, were repealed.[3])

---

[3] The text of G. L. c. 111, § 8C, as then adopted was: "The department in taking cognizance of the dental health of the people in the commonwealth shall recommend such methods as in its opinion are advisable to reduce or limit the prevalence of dental caries and other dental diseases and defects. If the commissioner determines that the fluoride content of the public water supply for domestic use in any city, town or district is not at optimum level for sound dental health, he shall so notify the local board of health . . .. Such board of health . . . shall, if it considers doing so in the best interest of the inhabitants of the city, town or district . . . order the upward adjustment of the fluoride content . . .. No such order shall be effective until it has been published in a newspaper having a general circulation in such city or town.

"The provisions of this section shall not apply if two or more cities or towns are supplied water from the same source, if such supply to

It was under § 8C, as just described, that the present case arose. On January 2, 1969, the State deputy commissioner of public health, Ernest M. Cook, sent a letter to the North Adams board of health, informing the board that "analysis of your public water supply . . . shows the fluoride content to be substantially below the optimum level for sound dental health." The board made no immediate response but on July 15, 1971, it approved unanimously an order "to augment the fluoride content of the city's water supply to the optimum of 1.0 parts/million recommended by the State Department of Health." Seven days later, a notice was published in the North Adams Transcript stating that "[t]he Board of Health of North Adams, after making sufficient inquiry into the matter, considers an upward adjustment of the fluoride content of the water supplies . . . to be in the best interests of the inhabitants of the city. Accordingly, it is hereby ordered that an upward adjustment to the optimum level . . . be made . . .." Opponents of fluori-

---

each city or town cannot be treated independently and if the majority of the boards of health representing such cities and towns have voted not to accept such recommendation; provided, however, that any such city or town desiring to adjust upward the fluoride content of . . . [its] water . . . may comply with the order . . . if it does not interfere with the water supply of said other cities or towns.

"In any city, town or district where the board of health has ordered the upward adjustment of the fluoride content of the water supply under the provisions of this section, upon petition of ten per cent of the registered voters . . . within ninety days of the publication of such order, the following question shall be placed upon the official ballot to be used at the next regular city election or for the election of town officers at the next annual town meeting: — 'Shall the fluoridation of the public water supply for domestic use in (this city) (this town) be continued?', or in such district the following question shall be placed before the next annual meeting of the inhabitants of the district: — 'Shall the fluoridation of the public water supply for domestic use in this district be continued?' If the majority of votes . . . is in the negative the fluoridation of the water supply . . . shall be discontinued."

For the effect of an amendment made by St. 1971, c. 1024, see n. 6 below.

dation, following the procedure of § 8C, collected within the statutory period the signatures of ten per cent of the registered voters. The statutory question, "Shall the fluoridation of the public water supply for domestic use in the City of North Adams be continued?", was therefore voted on at the November 2, 1971, city election. A majority voted yes. On February 17, 1972, the board asked the mayor to place $2,500 in its budget for a study by a consulting firm of the equipment and procedures needed to fluoridate the water. On March 28, 1972, the mayor complied in presenting a supplemental budget to the city council. The council, however, refused to appropriate the funds. After a second request and refusal by the city council, the board of health commenced the present actions.

1. (a) The defendants say that the notice published in the local newspaper was bad because it differed from the board's order: the order had mentioned the specific fluoride level to be reached, but the notice did not. We think the statutory statement that the "order" be "published" does not require word for word identity. The notice contains the essentials of the board's order and only an expert in fluoridation would be interested in or understand the significance of the precise fluoride concentration to be attained. The purpose of the publication was achieved in giving a notice sufficient to stimulate the opposition to collect signatures and present a petition.

(b) The defendants note that North Adams by agreement with Williamstown and Clarksburg provides water to about 228 service connections in the former locality and about fifty-two in the latter (the total of 280 was a very minor fraction of the connections served in North Adams), yet neither the Williamstown nor Clarksburg board of health was notified of the action of the North Adams board or agreed to it. Passing over the fact that no objection to fluoridation from Williamstown or Clarksburg users or the respective boards of health appears in the record, we think the statutory expression "if two or

more cities or towns are supplied water from the same source" does not apply to the present case; it refers to a case where two localities share a common supply, not to a case where, by agreement, one locality undertakes to provide water from its own supply as an accommodation to a limited number of users in adjoining communities. Here the water supply was that of North Adams, and the use by Williamstown and Clarksburg residents was incidental.[4]

2. The defendants argue, next, that the form of the question put before the voters, as specified by § 8C, namely, "Shall the fluoridation of the public water supply for domestic use in the City of North Adams be continued?", suggested that physical fluoridation had already begun at the time of the vote, which was not the case; therefore, say the defendants, the voters must have been so far misled as to be deprived of due process. We would agree that the Legislature's wording of the question as applied to the particular case was not as felicitous as it might have been, but we do not think the statute prescribing the question can be struck down as unconstitutional. In response to the question, those in favor of fluoridation would vote yes, and those opposed, no.[5] The question quite properly assumes that when, after the

---

[4] In its January, 1969, letter informing the North Adams board of health that the water supply contained too little fluoride, the State Department of Public Health told the board that, in the opinion of its general counsel, "[w]ith reference to the arrangement whereby certain premises in Williamstown and Clarksburg are served from your city public water system . . . fluoridation of your water supply is not contingent upon any affirmative action by the Towns of Williamstown and Clarksburg."

[5] In resolving the question whether, and how, to count ballots not marked by voters in accordance with instructions, so that the intent of the voter is unclear, we have said that "if the intent of the voter can be determined with reasonable certainty from an inspection of the ballot, in the light of the generally known conditions attendant upon the election, effect must be given to that intent and the vote counted in accordance therewith . . . ." *O'Brien* v. *Election Commrs. of Boston*, 257 Mass. 332, 338 (1926).

State department has made the necessary recommendation, the board of health promulgates an order, a program of fluoridation has been launched, and the dispute is as to its continuance.  Section 8C (as in effect on November 2, 1971) treats the board's order as "effective" on publication, but subject to later discontinuance if a petition should eventuate and the popular vote should turn out to be negative.[6]

We add that this is not a case where a question or proposition has been prepared in an ad hoc manner and its sufficiency is tested against the command or standard of a statute or constitutional provision calling for the vote. See *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230 (1946); *Tiberio* v. *Methuen,* 364 Mass. 578 (1974) (both upholding wording); *Sears* v. *Treasurer & Recr. Gen.* 327 Mass. 310 (1951) (holding wording bad).[7]  Here

---

[6] The situation is substantially changed as a result of an amendment to G. L. c. 111, § 8C, by St. 1971, c. 1024.  This amendment (aside from two changes immaterial for present purposes) delays the nominal effectiveness date of the board order until ninety days after the required publication, and further provides that if a petition for an election is filed within that time, the board order does not become effective until after a favorable vote in the election.  The purpose of the amendment, in the words of a message from the Governor returning it without signature for a minor change, "is to insure that the vote is taken before the fluoridation may occur."  1971 House Doc. No. 6418.

Despite this change, no revision was made by the amendment in the wording of the question to be presented to the voters.  The amendment also left unchanged the language about "discontinuance" of fluoridation if the vote was negative.  These were oversights.  In the circumstances, we think the legislative purpose as expressed in the current G. L. c. 111, § 8C, will best be served if in the future voters in a § 8C election are asked, "Shall (this city) (this town) fluoridate its public water supply for domestic use?"  This wording is substantially that ordered in *Selectmen of Greenfield* v. *Davoren,* No. 13,896, Super. Ct., Franklin County, Massachusetts, October 2, 1974, in an action by a town board of selectmen seeking a change in the statutory wording for an election to be held in November, 1974.

[7] Nor is this case like *Mayor of Gloucester* v. *City Clerk of Gloucester,* 327 Mass. 460, 464 (1951), in which this court held bad the wording of an election question on whether Gloucester should adopt

the wording of the question was prescribed by statute and the attack on the question is an attack on the statute on constitutional grounds. Added to the natural reluctance of courts to upset popular elections after the event, there is in the present case the presumption of constitutionality. *Pinnick* v. *Cleary*, 360 Mass. 1, 14 (1971). *Mobil Oil Corp.* v. *Attorney Gen.* 361 Mass. 401, 412 (1972). *Commonwealth* v. *Henry's Drywall Co., Inc.* 366 Mass. 539, 541 (1974).[8]

While it is hard to match cases, we note that in *Scott* v. *Election Commrs. of Newton*, 346 Mass. 388 (1963), we found nothing improper in the collection of signatures on a petition, and the filing of the petition asking to put on the ballot under old G. L. c. 40, § 41C, the question, "Shall the fluoridation of the public water supply for domestic use in this city be discontinued?", where no physical fluoridation had yet occurred when the signatures were collected, though the city had approved and was proceeding with a fluoridation program. Analogy can also be found in *Gray* v. *Taylor*, 227 U. S. 51 (1913) (Holmes, J.), where a vote was held on whether to change a county seat from one town to another, but the prescribed statutory form of ballot was "For County Seat," with a space for the writer to indicate his choice of town. The election was held valid although the ballot failed to indicate that one of the towns was already the county seat. Aside from finding that the omission was

---

a Plan E government. There the challenged wording was flatly in error in describing the election of the city council and school committee as being by proportional representation.

[8] There is also the problem, which we may overlook for present purposes, whether the mayor and city council have standing to raise the issue of the possible deprivation of the voters' due process rights. See *Ashwander* v. *Tennessee Valley Authy.* 297 U. S. 288, 347 (1936) (Brandeis, J., concurring); *Mullholland* v. *State Racing Commn.* 295 Mass. 286, 292 (1936); *Massachusetts Commn. Against Discrimination* v. *Colangelo*, 344 Mass. 387, 392 (1962); Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L. Rev. 423 (1974).

not misleading, the court said flatly that "it is enough that the statute was followed." 227 U. S. at 58. See also *Wycoff* v. *County Commrs. of the County of Logan, Kansas,* 189 Kans. 557 (1962).

3. It is contended, finally, that the board of health has no power to compel the city council to appropriate money: North Adams has a Plan A government, legislative power, including the power to appropriate funds, being vested in the city council pursuant to G. L. c. 43, § 50. The defendants point further to G. L. c. 44, § 31, providing that "[n]o department . . . of any city or town, except Boston, shall incur a liability in excess of the appropriation made for the use of such department, each item recommended by the mayor and voted by the council in cities . . . being considered as a separate appropriation."

General Laws c. 111, § 8C, can be reconciled with these laws. The Commonwealth has power to order a municipality to pay out funds for public purposes. Thus in *Commonwealth* v. *Hudson,* 315 Mass. 335 (1943), we enforced St. 1942, c. 8, which provided that " [i]f the department of public health determines that, during the existence of the present state of war, it is necessary for a city, town, district or water company maintaining a water supply to provide equipment for such supply . . . for the protection of the public health, said department may order such city, town, district or company to provide such equipment . . .." The department, acting under that statute, had ordered Hudson to chlorinate its water supply, but the town meeting had voted not to authorize the commissioners of public works to install the necessary equipment. On a bill in equity brought by the Commonwealth, this court found that the State department had authority to issue its order under the statute, and that the town was not privileged to ignore the order. We enforced the order by directing the town to provide the necessary equipment at the town's expense. We wrote that the town was not in a position "to defy . . .

the Commonwealth, or to attempt to nullify legislative mandates," 315 Mass. at 345, and accordingly rejected the town's contention, "which . . . [was] without precedent in our experience . . . that the power to appropriate money . . . is vested exclusively in the voters at town meeting . . .; that they have a right to act according to their untrammeled judgment, and may refuse to appropriate money even to discharge adjudicated duties or obligations of the town; that the Commonwealth and its courts are powerless unless the voters . . . in town meeting give their approval." 315 Mass. at 343-344. See *Horrigan* v. *Mayor of Pittsfield,* 298 Mass. 492, 499 (1937) ("In the performance of public functions . . . [municipalities] may be required . . . to assume new liabilities without their consent"); *Attorney Gen.* v. *Board of Pub. Welfare of Northampton,* 313 Mass. 675, 683-684 (1943) (writ of mandamus issued on petition of Attorney General requiring city to comply with decision of State department of public welfare and render adequate welfare aid to specified individual); *Ford* v. *Retirement Bd. of Lawrence,* 315 Mass. 492, 494 (1944) ("The Legislature may prescribe the terms and conditions of pensions . . . [of firemen, and] place the burden of paying them on cities and towns . . . ."); *Director of Div. of Water Pollution Control* v. *Uxbridge,* 361 Mass. 589 (1972) (enforcing division order to town to construct sewage treatment facility).

The question in each case is thus whether the State enactment is fairly to be read as intending to require municipal outlay. If it is, the arrangement of municipal functions under the city charter or in the town government can have no effect on the result. Further, nothing in the Home Rule Amendment (art. 89 of the Amendments to the Constitution of the Commonwealth) stands in the way, as long as the statute falls within the power reserved to the General Court under § 8 of the Amendment "to act in relation to cities and towns . . . by general laws which apply alike to all cities, or to all

towns, or to all cities and towns, or to a class of not fewer than two . . .." See *Director of Div. of Water Pollution Control* v. *Uxbridge, supra* (Massachusetts Clean Waters Act, G. L. c. 21, §§ 26-53, is a "general law" under which the State division may order the town to construct a sewage treatment facility); see also *Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dept. of Community Affairs,* 363 Mass. 339, 359-369 (1973).

Nor does G. L. c. 44, § 31, present an obstacle. This provides an important central municipal control on irresponsible spending by departments of local governments, but its function is not to bar local spending that is required by a valid State program. Section 31 regularly has been harmonized with other legislation, as in *Lynn Redevelopment Authy.* v. *Lynn,* 360 Mass. 503 (1971), where we read the State urban renewal law as overcoming § 31 to the extent of allowing the city to make contracts for an urban renewal project although there was not at the time an appropriation of the sum necessary to fund the project.[9]

Thus the problems posed as to the effect of the general lodging of the power of appropriation in the city council of North Adams under Plan A, and as to the effect of G. L. c. 44, § 31, reduce to the task of discerning whether it is part of the intent of G. L. c. 111, § 8C, that the fluoridation program shall not be defeated by local refusal to loosen the purse strings. An examination of the complex of statutes governing water supply in the

---

[9] See also *Callahan* v. *Woburn,* 306 Mass. 265 (1940); *Ring* v. *Woburn,* 311 Mass. 679 (1942); *Hayes* v. *Brockton,* 313 Mass. 641 (1943); *Watt* v. *Chelmsford,* 328 Mass. 430 (1952) (G. L. c. 71, governing schools, prevails over § 31 and school committee may bind municipality to pay teacher salaries and other costs despite the lack of a prior appropriation). Cf. *Salisbury Water Supply Co.* v. *Salisbury,* 341 Mass. 42 (1960) (§ 31 does not prohibit a town department from contracting for services extending beyond a single year, despite the lack of appropriations to cover subsequent years, since otherwise it would be very difficult to contract for, e.g., water service).

Commonwealth suggests that actions by municipalities are by and large checked by the State, and that the State can exercise affirmative control in many circumstances. See G. L. c. 40, §§ 38, 39B; G. L. c. 111, §§ 5, 5G, 17. More directly to the point, as we have indicated, § 8C accords with the scheme of the bill proposed by the special commission in 1968 that "water fluoridation be instituted at the discretion and recommendation of the State Commissioner of Public Health with the concurrence of the local board of health." The statute thus placed primary authority for the initiation of fluoridation in the hands of the State department. Moreover, it provides that the local board of health, acting on State recommendation, can "order" fluoridation. The word "order" would be inappropriate if it did not comprehend the power to compel appropriation. Without such a power, the board of health could do no more than request the mayor and council to fluoridate a water supply, and this, we think, would be a good deal less than the statute intended.[10] It is significant that whereas the statute makes explicit provision for the public cancelling of a program of fluoridation by means of a referendum vote, no similar power was vested in the local legislative body — the mayor and council. In sum, we read the statute as disclosing the necessary State purpose.

The thought about State "purpose" or "intent" can be expressed in other ways. We can say that the General Court may, when necessary or convenient, delegate a particular job or function to a local body,[11] the local

---

[10] We do not suggest that, should a board of health request an appropriation that is far in excess of the amount reasonably necessary for the purpose of fluoridation, the mayor and city council could not substitute a lower, adequate figure. There is no suggestion in the present case that the board's request was excessive.

[11] See *Police Commr. of Boston* v. *Boston*, 239 Mass. 401, 407 (1921) (St. 1906, c. 291, delegates to police commissioner the power of deciding on the land necessary for police accommodations in Boston); *Bradley* v. *Zoning Adjustment Bd. of Boston*, 255 Mass. 160,

body becoming for the purpose an "agent" of the State. We held in *Breault* v. *Auburn,* 303 Mass. 424, 427-428 (1939), that G. L. c. 111, § 27, giving local boards of health authority to employ necessary personnel, precluded interference by the town meeting in a board decision to discharge an individual. We said that "[i]n their conduct with relation to the contract of employment of the plaintiff . . . the members of the board were exercising powers conferred upon them by the Legislature and were . . . not [acting] as agents of the town." Accord, *Gibney* v. *Mayor of Fall River,* 306 Mass. 561 (1940).[12] Similarly, the board of health of North Adams may be regarded as a State agent with derivative power to compel funding by the city council for the particular purpose of fluoridation.

4. The Superior Court, acting on the bill for declaratory relief, entered a decree which may be read as somewhat exceeding a declaration and amounting to an order to the city council to provide the necessary funds. In an ordinary case between private parties this might be entirely proper as merely anticipating an application for "further relief" by the party who secured the declaration. See G. L. c. 231A, § 5. But "[w]e commonly assume that municipalities and public officers will do their duty when disputed questions have been finally adjudicated."

---

171 (1926) (St. 1924, c. 488, § 20, delegates to board of zoning adjustment of Boston power to change boundaries of zoning districts established by Legislature); *Rayco Inv. Corp.* v. *Selectmen of Raynham, ante,* 385 (1975) (G. L. c. 140, § 32B, delegates to local boards of health the power to make rules and regulations to aid in enforcement of mobile home park licensing provisions). See also G. L. c. 111, § 160, permitting the State department of public health to delegate to local boards of health the power to grant and withhold permits required by State department rules for the prevention of pollution.

[12] See *Malden* v. *MacCormac,* 318 Mass. 729 (1945) (board of health acting under power granted to it by G. L. c. 111, §§ 31A, 31B, to control local garbage collection is not acting as an agent of the municipality for purposes of determining municipal liability in tort).

*Commonwealth* v. *Hudson,* 315 Mass. 335, 343 (1943). Accordingly, the decree on the bill for declaratory relief will be modified so as simply to declare the rights between the parties. The decree of dismissal of the companion equity bill will be affirmed.

*So ordered.*

QUIRICO, J. (dissenting). I am unable to agree with the conclusion in point 3 of the court's opinion to the effect that the board of health of the city of North Adams has the power to compel the mayor and city council to appropriate the funds necessary to carry out the board's decision to fluoridate the city's water supply. This decision is tantamount to a holding that as to fluoridation the board is not subject to the fundamental provision of the municipal finance law (G. L. c. 44, § 31, as amended through St. 1969, c. 505, § 7) that "[no] department financed by municipal revenue, or in whole or in part by taxation, of any city or town, except Boston, shall incur a liability in excess of the appropriation made for the use of such department . . . except in cases of extreme emergency involving the health or safety of persons or property, and then only by a vote in a city of two thirds of the members of the city council, and in a town by a majority vote of all the selectmen." The court's decision in this case does not rest on any claimed emergency.

It is unquestionable that the Legislature has the power to authorize the State Department of Public Health to compel municipalities to fluoridate their public water supplies. It is equally unquestionable that, if the Legislature gave the department that authority and the department exercised it against a municipality, the order could not be thwarted by the municipality's failure or refusal to appropriate the funds necessary therefor. That was decided by this court in *Commonwealth* v. *Hudson,*

315 Mass. 335 (1943), where the department, acting under express authority granted to it by St. 1942, c. 8, ordered the town of Hudson to provide treatment equipment for chlorinating its water supply. That statute authorized the department to enter such an order directly against a municipality, leaving the latter no choice or discretion in the matter.

By contrast, the statute relating to fluoridation (G. L. c. 111, § 8C, inserted by St. 1968, c. 548, § 1, and amended by St. 1971, c. 1024, §§ 1, 2) limits the power of the department to the making of recommendations of "such methods as in its opinion are advisable to reduce or limit the prevalence of dental caries and other dental diseases and defects," and to notifying a municipality that "the fluoride content of . . . [its public water supply for domestic use] is not at optimum level for sound dental health." However, the statute gives to the local board of health, and not to the department, the power of ultimate decision whether to fluoridate the water supply. In my opinion there is nothing in the statute which should be construed to exempt the local board's exercise of that power from the provision of G. L. c. 44, § 31, which prohibits each "department financed by municipal revenue, or in whole or in part by taxation, of any city or town . . . [from incurring] a liability in excess of the appropriation made for the use of such department."

I do not believe that the fact that G. L. c. 111, § 8C, authorizes a local board of health to exercise its power thereunder by the issuance of an "order" that the water supply be fluoridated is of any material significance on the applicability of the prohibition contained in G. L. c. 44, § 31. The word "order" is often used to identify or indicate the means by which municipal boards, commissions or officers exercise the powers vested in them by statute, but the use of that word or title has never been held to authorize an expenditure of public funds in excess of the limitations imposed by G. L. c. 44, § 31.

The court's opinion in this case gives to a municipal board of health desiring to order the fluoridation of the public water supply substantially the same degree of fiscal autonomy which has long been enjoyed by school committees in submitting their annual budget requests. The school committees' autonomy is based on the express command of G. L. c. 71, § 34, as appearing in St. 1939, c. 294, that "[e]very city and town shall annually provide an amount of money sufficient for the support of the public schools as required by this chapter." By contrast, the statute relating to fluoridation, G. L. c. 111, § 8C, contains no express statutory command to municipalities to provide the funds therefor when requested by boards of health, and, in my opinion, the statute should not be interpreted as including an implied command to that effect. *Decatur* v. *Auditor of Peabody*, 251 Mass. 82, 88-89 (1925).