THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSEPH KOLLARIK, JOHN DABAL AND EDWARD DABAL, DEFENDANTS-APPELLANTS.

Argued October 29, 1956—Decided November 19, 1956.

*Mr. James A. Major* argued the cause for appellants (*Mr. Joseph H. Gaudielle,* on the brief).

*Mr. William J. Arnold,* Assistant Prosecutor of Bergen County, argued the cause for the State (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney; *Mr. William C. Brudnick,* Special Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

WACHENFELD, J.  This is an appeal from a judgment of the Superior Court, Law Division, Bergen County, convicting the three defendants of conspiracy to pervert and obstruct the due administration of the bidding laws of this State. The defendant Kollarik was convicted additionally of misfeasance in office as a councilman of the City of Garfield. The cause was certified here on our own motion while pending in the Appellate Division.

The defendants John Dabal and Edward Dabal, with Joseph Kollarik, were indicted on three charges of conspiracy. As already indicated, there was also an individual indictment against the defendant Kollarik for misfeasance in office. The indictment charging a conspiracy among the three defendants to pervert and obstruct the due course of justice by destroying certain bids on file with the purchasing agent of the City of Garfield was disposed of by a direction for a judgment of acquittal and is not here involved. Likewise, the indictment charging a conspiracy among the three defendants to cheat and defraud the City by means of false and fraudulent vouchers fell by the wayside by reason of a direction of the court.

The indictment on which all of the defendants were convicted charged a conspiracy to illegally interfere with the administration of the bidding laws of the State of New

Jersey by causing contracts in excess of $1,000 to be let without public bids.

Kollarik was a councilman of the City of Garfield. The Dabals were members of a partnership engaged in the tree servicing business and did considerable work for the City of Garfield. Prior to the period in question, April 1, 1954 to February 1, 1955, the city had instituted a requisition and purchase order system. Under this procedure, requisitions were issued by the department heads and committee chairmen of the various committees and departments of the city to the purchasing agent, who was the secretary to the mayor. The purchasing agent would then make out a purchase order for the particular work involved, and after the work was done the voucher would be submitted, approved by the city controller and authorized for payment by the council.

One Joseph Russinko was the secretary to the mayor and the purchasing agent for the city. He testified that during the course of his work as purchasing agent he had received requests from several of the councilmen, including Kollarik, for the cutting of trees in the city. All of these requests for cutting trees were referred by him to Kollarik because he was the chairman of the Public Works Department. The requisition for each purchase order issued by Russinko for the cutting of trees came from Kollarik and in each instance it was signed by him and contained the vendor's name already typed in. There were three bids submitted with each requisition, but Russinko was always advised to make out the purchase order to the same firm, Dabal & Sons.

On one occasion, July 12, 1954, Kollarik brought in three requisitions for tree work which were dated July 12, July 30 and August 12, 1954. When Kollarik discovered that Russinko was busy, he asked Russinko for purchase orders and arranged for the preparation of them himself. The orders were all made out on July 12, but only one bore that date while the other two were postdated July 30 and August 12, 1954.

When these three requisitions were submitted on July 12, 1954, three bids for tree cutting were received from Kollarik

for each requisition. In each instance one bid was from Dabal & Sons, appropriately dated according to the requisition, and two were undated bids, from Burek and Matorrese, respectively. Burek's bids were admitted not to be genuine. As to the bids of Matorrese, the proof indicates they were prepared by Russinko after a telephone conversation with the defendant Kollarik during which Russinko was urged to destroy the original bid and substitute identical copies. Apparently, even the original Matorrese bids were fraudulent, and the inference is they were prepared by someone other than Matorrese.

The falsity of these bids can hardly be questioned. The proof came from two witnesses employed by the city who testified they typed the bids for Kollarik.

During the year 1954 the Dabals received from the City of Garfield the sum of $16,038 for cutting trees, and it was shown that no resolution was ever passed by the council for receipt of bids for cutting trees nor was any resolution passed to publicly advertise for such bids.

An examination of the requisitions, orders, vouchers, checks and bids indicates that the requisitions for work were all signed by the defendant Kollarik; that they all have altered dates; that the bids of the Dabals attached to these requisitions also have altered dates, and the amount of the bids and the payments made on the vouchers submitted for work allegedly done during the 1954 "Hurricane Hazel" are each in a sum slightly under $1,000.

The record shows that for work during this hurricane the Dabals received $4,075, collected through five vouchers, each under $1,000. Although the police and others testified only about 14 trees fell during the hurricane night, the Dabals' vouchers covered 103 trees cut and trimmed.

A comparison of all of the bids submitted during this period for tree work makes interesting reading. In each case the Dabals' bid is lowest, while every bid of Burek is second lowest and every bid of Matorrese is highest.

Kollarik admitted the bids of Matorrese and Burek were false. He averred they were submitted for "political reasons

to get a good price and to keep the rabble rousers quiet." He testified it was at the insistence of the mayor on the night of the hurricane that he called Dabal & Sons to cut the fallen trees, but the mayor recalled no such conversation. Kollarik further testified he examined the vouchers; that he knew only 10 to 17 trees had fallen during the hurricane, but he could not account for the additional trees cut due to the emergency. He stated the fictitious bids were made up in the presence of Russinko and the mayor in the mayor's office, which, of course, was denied by the mayor.

As to the indictment alleging misfeasance, it was additionally shown that an employee of the city worked for a period of three days painting the screens and windows on Kollarik's house.

The State brands Kollarik's testimony as "consistently inconsistent."

The trial judge denied several motions to dismiss the indictment for conspiracy to pervert and obstruct the due administration of the bidding laws and the indictment charging misconduct in office on the part of Kollarik. His refusal so to do furnishes the main basis for the appeal presently before us.

With reference to the conspiracy indictment, the defendants claim there is no proof from which a conspiracy of the type charged can be inferred. They aver the City of Garfield for years had a policy of cutting and removing trees without public bidding and that the responsibility of not calling for bids was as much upon the other members of the council as it was upon the defendant Kollarik; that the urgent nature of the work made public bidding impracticable, since fallen trees have to be cleared immediately for the protection of the public. They insist that to infer corruption from the method followed here is to "outrage common sense."

█ The record impresses upon as a contrary view. The evidence is overwhelming and vigorously sustains the allegations in the indictment. There are many inconsistencies, suspicious circumstances, misstatements, actual admissions and an abundance of evidence from which the jury could

readily infer that in the matter of removing trees there was an unlawful agreement designed to subvert the statute requiring bids.

The nub of the indictment is an agreed contrivance among the parties to see that the work of cutting trees was awarded to the Dabals by splitting it into amounts less than $1,000 so no bidding would be necessitated. If this be true, there was a breach of the law and a perversion of the bidding statutes.

The frequency of the vouchers, the pattern of bids, requisitions and purchase orders at less than $1,000, false bids, the alteration of dates, the issuance of three orders on one day but with different dates, and the other testimony submitted were more than sufficient to permit an inference of guilt to be logically and legitimately drawn.

The test on a motion of a defendant for judgment of acquittal is whether there is any legal evidence before the jury from which an inference of guilt can be legitimately drawn. *State v. Picciotti,* 12 *N. J.* 205 (1953); *State v. Bricker,* 99 *N. J. L.* 521 (*E. & A.* 1924); *State v. Fox,* 12 *N. J. Super.* 132 (*App. Div.* 1951); *State v. Rogers,* 19 *N. J.* 218 (1955).

As to the misconduct in office charged, there was direct testimony by an employee which could hardly have been doubted.

The defendant insists the statute is limited to materials and supplies and has nothing to do with personal services. In addition to employing the words "materials, supplies," the statute also uses the words "any work * * * or labor."

Much criticism in the defendants' brief is leveled at the doctrine of criminal conspiracy. It is said under this general form of prosecution it is most difficult to ascertain precisely the crime charged. 62 *Harv. L. R.* 276 is cited, wherein the author says:

"The elasticity of its substantive and procedural attributes has indeed made it the 'darling of the modern prosecutor's nursery.'

At the same time, however, serious dangers of abuse and oppression inhere in this elasticity."

The potentialities of abuse, it observes, have evoked severe criticism from judges and commentators, and this form of law enforcement has frequently been found in sharp conflict with the customary protection afforded defendants.

These views and criticisms, no matter how impressive, do not of themselves wipe the crime from our statute books. It is still there, and despite the disparagement the Legislature has not seen fit to expunge or restrict it. No matter how dramatically it refers to the possibilities of the defendants' being engulfed in a whirlpool of confusion under this concept of procedure, in the case *sub judice* there is little merit in the suggestion that the defendants were not fully cognizant of the complaints made against them or the facts upon which they were based.

Our examination of the record reveals no error in the court's refusal to dismiss the indictments on the motions made. There was proof of the preparing of false bids, the altering of dates, the submission of undated bids, the grouping of the work into units of less than $1,000, the submission of vouchers for work aggregating over $4,000 in units of less than $1,000 each, obviously having for its ultimate purpose the avoidance of the law in question. In this status it would have been highly improper for the court to dismiss the State's case.

Next it is said there was error in refusing to permit the defendants to introduce proof to show the relationship of the defendants Dabal with the City of Garfield from the very time they commenced to work for the municipality, citing *State v. Neiman*, 123 *N. J. L.* 341 (*Sup. Ct.* 1939), affirmed 124 *N. J. L.* 562 (*E. & A.* 1940).

That case is pointed to a question where the credibility of a witness is impeached, and no such attack was made in the case *sub judice* making the ruling applicable.

██ Determination of the questions of remoteness, relevancy and materiality is a matter of judicial discretion, and the finding made at a trial level is not reviewable unless

it appears there was a palpable abuse of that discretion. *State v. Tansimore,* 3 *N. J.* 516, 530 (1950). Here not only was there no proof that the appellants were injuriously affected to a substantial degree requiring a reversal, but despite the ruling, evidence of the long-standing practices frequently reached the jury through the testimony of several witnesses.

The defendants urge error in the court's charge that the jury could find concerted action among the defendants from five separate bills furnished under date of November 18, 1954 in a total amount in excess of $4,000, with each one under $1,000. But the defendants cull from the record the selected portions of the charge and consider them out of context and unconnected with the preceding and subsequent paragraphs of the charge. A single sentence may not be extracted and construed without regard to the context of the entire charge. The court cannot state the law in a single sentence, and the charge must be read as a whole in the light of a sensible construction to determine its legal worth. *State v. Tansimore, supra.* When so considered, the charge of the court on conspiracy was full, fair and accurate.

Next it is said that while the court charged that one of the three essential elements of the crime of conspiracy was intent, he failed to define it. A reading of the full charge hardly supports the claim. Additionally, there was no request to charge on the particular point submitted by the defendants. See *State v. Geltzeiler (Green),* 2 *N. J. Misc.* 1106 *(Sup. Ct.* 1924), affirmed 101 *N. J. L.* 415 *(E. & A.* 1925).

Error, it is said, was committed when the court charged: "And they act at their peril with knowledge of it if they do not comply with it when they deal with the municipality." It is contended this placed "a peculiar responsibility * * * on these defendants to see that the municipality complied with the statute."

We do not so read it. This portion, taken into consideration with the entire charge, seems free of criticism.

There are other points made, lacking sufficient merit, however, to require their specific disposition.

We have examined the entire record and find no error in the rulings on evidence, on the motions of the defendants, or in the court's charge prejudicial to the extent where a reversal is required.

The judgment of conviction below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6.

*For reversal*—None.