CENTRAL TOW CO., INC. *vs.* CITY OF BOSTON.

Suffolk.     September 16, 1976. — November 15, 1976.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & WILKINS, JJ.

*Municipal Corporations,* Contracts.   *Contract,* Validity, With municipality, Towing motor vehicles.

Where there was no express contract between the city of Boston and a tow company which towed and stored automobiles upon request of city officials, the city was not liable for towing and storage charges with respect to automobiles which were unclaimed by their owners. [343-345]

BILL IN EQUITY filed in the Superior Court on October 5, 1972.

The suit was heard by *Prince,* J., on a master's report.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Sumner H. Woodrow* for the plaintiff.

*Kevin F. Moloney,* Assistant Corporation Counsel, for the city of Boston.

KAPLAN, J.   The plaintiff company, authorized by the
Department of Public Utilities to engage in towing and
storing motor vehicles, sued the defendant city of Boston[1]
for charges calculated at $46,010 incurred — so the claim
asserted — for towing and storing 104 vehicles in the pe-
riod from October, 1971, to July, 1972, at the alleged re-
quest of the city.[2] After a responsive pleading by the city,
a judge of the Superior Court on August 26, 1974, referred
the matter to a master who rendered a report favoring the
plaintiff. On motion of the plaintiff to confirm and of the
city to reject the report, the judge accepted the master's
subsidiary fact findings, but, disagreeing with the mas-
ter's general findings (grounded on legal rulings) and
conclusions of law, the judge ultimately directed entry of
judgment for the city.[3] The plaintiff having appealed to the
Appeals Court, we brought the case here on our own
motion.

On sundry occasions the Boston police enlisted the aid
of tow companies to remove private vehicles from the city
streets. The most common occasion was when a car was
parked in a prohibited area, such as a hospital zone, or
offended the law in some similar fashion. So also the police
saw to the removal of abandoned or stolen cars, and cars
left after traffic accidents or like casualties. Yet another
category was cars constituting evidence in criminal matters.

In any of these instances a police officer from a police
division would telephone one of the tow companies — the
plaintiff was but one of a number of companies engaged in

---

[1] Also named as defendants were the Commonwealth and Boston po-
lice Sergeant Anthony DiNatale. The Commonwealth was dismissed by
consent. The master found no basis for liability on the part of DiNatale,
and the plaintiff does not pursue the matter further.

[2] A claim for general damages, originally made, may be taken as
abandoned. The figure in the text represents the computation made by
the master.

[3] This is proper procedure under Mass. R. Civ. P. 53, 365 Mass. 817
(1974) (see, e.g., *W.R.B. Corp.* v. *Geer,* 332 F.2d 180 [5th Cir.], cert.
denied, 379 U.S. 841 [1964]), just as it was under our prior practice.
See, e.g., *Moore* v. *Worcester Insulation Co.,* 338 Mass. 44, 46-47 (1958);
*Smith* v. *Graham Refrigeration Prods. Co.,* 333 Mass. 181, 184 (1955).

Central Tow Co. *v.* Boston.

this line of work — and notify it of the location of the car to be towed. A company was not obligated to act in response to any call received but customarily it would respond if its equipment was then available. The plaintiff towed "hundreds" of cars during the period in question.[4] In by far the larger number of cases the car owners, after doing what was necessary to discharge any violations, would appear at the company's storage lot, pay the towing and storage charges,[5] and remove their vehicles,[6] the city not being expected to play any part. In a relatively few cases the owners did not turn up and the cars accumulated charges. The 104 cars involved in the present lawsuit were thus unclaimed; a breakdown by the categories in which the cars fell is given in the margin.[7]

The plaintiff asserted in this lawsuit that the city was responsible for payment of the charges accumulated on these vehicles, but we agree with the judge below that there was no legal basis for that assertion. The measure of the case lies in the finding of the master that "[n]o express conversation or communication ever occurred between City of Boston officials and plaintiff regarding payment for towing and storage of motor vehicles." No doubt it was most

---

[4] The plaintiff also towed cars on notification by the Metropolitan District Commission and Capitol police.

[5] The charges were regulated by the Department of Public Utilities. (It appears that the amount claimed in this action is calculated according to such regulated rates.)

[6] The usual routine described by the master was for the company to give the police officer on the scene an identification card, retaining the ticket portion; the car owner obtained the identification card and presented it when claiming the car from the company.

[7] As listed by the master with amounts claimed: abandoned, thirty-two vehicles, $14,690; stolen, ten, $2,709; custody (evidence in case), three, $796; accident, twenty-two, $6,551; "tow and hold," eighteen, $10,088; *Hotel Vendome* fire, two, $1,308; traffic hazards, seventeen, $9,868.

"Tow and hold" apparently represents cars on which there were numerous violations that had to be made good before the owners could claim the cars from the plaintiff (see St. 1929, c. 263, § 2, as amended through St. 1973, c. 253).

Apparently the plaintiff was rid of all these cars by August 31, 1972; details are not clear.

imprudent of the parties not to have entered into an express contract about vehicles that would remain in the plaintiff's hands, for it was plainly foreseeable that some might be so stranded. That the parties were neglectful, however, did not repair the absence of the elements, fixed by statutes, which were essential here to the formation of a contract casting liability on the city: a public bidding procedure, as the estimated cost of the contemplated work might exceed $2,000;[8] a writing and other formalities as required for a contract of that size;[9] an official acting for the city who was authorized thereunto;[10] and a prior

---

[8] Statute 1909, c. 486, § 30, as amended through St. 1955, c. 60, § 2, provides that, unless the mayor gives written authority to do otherwise, those having power to incur obligations on behalf of the city must "invite proposals ... by advertisements in the City Record" for contracts for any work or purchase, "the estimated cost of which alone, or in conjunction with other similar work or purchase which might properly be included in the same contract, amounts to or exceeds two thousand dollars." Although each tow was in some sense a separate transaction which likely would not reach $2,000, one could foresee multiple similar situations of unclaimed cars which would aggregate that amount and so the public bidding procedure was appropriate under the statute and the decisions. Cf. *Armco Drainage & Metal Prods., Inc.* v. *County of Pinellas,* 137 So. 2d 234 (Fla. Dist. Ct. App. 1962); *State* v. *Kollarik,* 22 N.J. 558 (1956); *Fonder* v. *South Sioux Falls,* 76 S.D. 31 (1955); *Menzl* v. *Milwaukee,* 32 Wis. 2d 266, 272-273 (1966).

Some of the tows were presumably referable to St. 1929, c. 263, § 2, as amended through St. 1973, c. 253, which authorizes the traffic and parking commission to permit removal of certain illegally parked or obstructing vehicles by employees of the police department, or "by an independent contractor selected on the basis of competitive bids invited by advertisement in the City Record ...." The master found that the plaintiff had submitted a bid under such a proposal but no contract was awarded.

We are not called on here to suggest the terms of such public bid proposals.

[9] St. 1890, c. 418, § 6, as amended through St. 1955, c. 60, § 1: "All contracts made by any department of the city of Boston ... shall, when the amount involved is two thousand dollars or more, ... be in writing"; approved in writing by the mayor; and with certification by the city auditor "that an appropriation is available" or statutory authority exists which excuses the lack of an appropriation. "All such contracts shall be accompanied by a suitable bond or deposit of money or other security ...."

[10] St. 1885, c. 266, § 6, as amended through St. 1941, c. 604: The several officers and boards of the city "shall, in their respective depart-

appropriation to which the claimant can point (there being no "extreme emergency" warranting an exception).[11] As was said in *Adalian Bros.* v. *Boston,* 323 Mass. 629, 632 (1949), those who deal with the city of Boston are "bound by the statutory regulations as to the manner in which the city [can] legally make contracts," and these limitations "cannot be evaded by first rendering services or furnishing supplies without an express contract and then claiming under an implied contract for work performed or for goods sold and delivered. In such cases there is no implied contract." See *Sancta Maria Hosp.* v. *Cambridge,* 369 Mass. 586, 595 (1976); *Lord* v. *Winchester,* 355 Mass. 788, 789 (1969); *Lowell* v. *Massachusetts Bonding & Ins. Co.,* 313 Mass. 257, 272 (1943); *Morse* v. *Boston,* 253 Mass. 247 (1925); *McGovern* v. *Boston,* 229 Mass. 394, 397-398 (1918).

The plaintiff has cited various statutes under which motor vehicles privately owned may lawfully be cleared from the city streets but, upon inspection, none of them goes to the point of charging the city with the costs of towing and storage at the suit of a company which answered the calls of police officers without the protection of a contract.[12]

*Judgment affirmed.*

ments, make all necessary contracts for the employment of labor, the supply of materials, and the construction, alteration and repair of all public works and buildings . . . ."

[11] St. 1909, c. 486, § 16: "No official of [the] city, except in case of extreme emergency involving the health or safety of the people or their property, shall expend intentionally in any fiscal year any sum in excess of the appropriations duly made in accordance with law, nor involve the city in any contract for the future payment of money in excess of such appropriation . . . ." That the problem that developed in the present case was foreseeable and thus not an "extreme emergency" under the statute, see *Safford* v. *Lowell,* 255 Mass. 220, 225 (1926).

[12] See G. L. c. 90, § 22C, as appearing in St. 1967, c. 748 (permits, but does not require, "superintendent of streets or other officer having charge of the public ways" to take possession of or exercise dominion over abandoned motor vehicles); G. L. c. 135, §§ 7-8 (permits, but does not require, the Boston police department in certain circumstances to

---

sell vehicles that have come into its possession which it deems to be stolen, lost, abandoned, or taken from persons under arrest); G. L. c. 255, § 39A (authorizes members of the police force to place in storage vehicles involved in accidents and permits garage owners subsequently to sell unclaimed vehicles and recover storage costs after a given period of time).