BOSTON GAS COMPANY vs. CITY OF BOSTON.

Suffolk.  February 10, 1982. — April 6, 1982.

Present: HALE, C.J., ROSE, & GREANEY, JJ.

*Public Utilities.  Gas Company.  Municipal Corporations*, Contracts, Municipal finance.  *Contract*, Municipality.

A gas company supplying natural gas to the city of Boston was entitled to recover from the city the difference which should have been charged for the natural gas according to rates established by the Department of Public Utilities under G. L. c. 164, § 94, and a lower price which was billed by the company by mistake and paid by the city, even though the parties had never entered into a written contract approved by the mayor, and sufficient funds had not been appropriated to pay for the gas at the established rates.  [410-415]

CIVIL ACTION commenced in the Superior Court on October 18, 1977.

The case was heard by *Garrity* , J., on motion for summary judgment.

*Gerald McTernan*, Assistant Corporation Counsel, for the defendant.

*Paul B. Galvani* (*H. Reed Witherby* with him) for the plaintiff.

HALE, C.J.  In this action brought in the Superior Court, the plaintiff seeks to recover nearly a half-million dollars for natural gas supplied to the Charles Street jail (jail) from 1969 through 1977 but never charged to the defendant as a result of a billing error repeatedly committed by the plaintiff over a seven-year period.  Prior to trial the plaintiff moved for summary judgment (see Mass.R.Civ.P. 56, 365 Mass. 824 [1974]) based on the pleadings, discovery materials, and affidavits.  That motion was allowed, and a judgment for $465,203.81, plus interest from the date of demand was entered for the plaintiff.  The defendant appeals, con-

tending that the plaintiff's noncompliance with two provisions of the municipal finance laws preclude it from enforcing its otherwise liquidated claim. In response, the plaintiff argues that, despite its failure to comply with those provisions, G. L. c. 164, § 94, imposes an absolute obligation on the defendant to pay for all of the gas supplied to the jail. Neither party contends that there are any disputed questions of material fact, and we are therefore presented with the need to resolve the apparent conflict between these two statutory schemes. We affirm the judgment.

These are the facts. At all times material to this action the defendant, pursuant to the requirements of G. L. c. 40, § 34, and G. L. c. 126, § 33, has operated and maintained a lockup facility known as the Charles Street jail. In 1969 the Boston public facilities commission, faced with having to do something about "the substantial air pollution which was being emitted from the jail . . . [by] the then-existing coal-fired system," authorized the conversion of the jail to gas heat. Following the completion of that conversion in the summer of 1969, the plaintiff began to supply gas to the jail and continued to do so throughout the period in dispute.

As was the case with other utilities supplying services to the defendant, the plaintiff never entered into a written agreement with the defendant concerning its service to the jail.[1] Nevertheless, the plaintiff regularly submitted statements to the defendant for the amounts it believed were due for the gas supplied to the jail and these statements were paid in due course. All such payments were made pursuant to appropriations for this purpose. Until 1976 those appro-

---

[1] One of the documents accompanying the plaintiff's motion for summary judgment in the Superior Court was the deposition of a "principal accountant" employed by the defendant. In that deposition the accountant stated that the parties never entered into a contract concerning the plaintiff's service to the jail and that the defendant places all utilities in "non-order" accounts which do not involve written contracts. In explaining this policy, the accountant stated: "One reason is the fact that [the city] must have the utilities." It appears that the defendant has not entered into a contract for utility services since at least 1954 and that this policy remains in effect despite its position in this litigation.

priations were sufficient to cover the amounts billed to the defendant by the plaintiff. It is obvious that none of those appropriations would have been adequate had the plaintiff properly billed the defendant for the gas actually used at the jail.

As a result of an audit of large-scale gas users conducted in September, 1976, the plaintiff discovered that the defendant had been billed for only one-tenth of the gas consumed at the jail since the 1969 conversion. This error occurred when the meter which recorded the gas consumed at the jail was misread by the plaintiff's employees as indicating hundreds rather than thousands of cubic feet. The plaintiff promptly informed the defendant of this error and cancelled all outstanding bills. Revised bills, reflecting the actual amount due for the period then outstanding (July-September, 1976), were sent to the defendant and were paid. The total amount paid by the defendant for gas service in 1976 was $59,515.71, nearly four times the $15,000 appropriated for the purpose in that year. When the plaintiff sought to recover the $465,203.81 difference between the amount paid by the defendant from July, 1969, through June, 1976, and the amount that it would have been charged had the meter been properly read, the defendant refused to pay, thereby precipitating the present dispute.

In urging us to affirm the judgment of the Superior Court, the plaintiff argues that this case is controlled by principles of utility rate enforcement. It contends that, under those principles, once rates are validly established by a public rate-making authority, it becomes the absolute duty of all who accept the services or products regulated thereunder to pay for them according to the rates so established. Because the Department of Public Utilities (DPU) is required by statute to examine and to approve the rates that the plaintiff may charge,[2] and because the undisputed effect of the bill-

---

[2] General Laws c. 164, § 94, as amended through St. 1973, c. 816, §§ 2 & 3, provides that gas companies "shall file" schedules showing the rates to be charged for the sale of gas in the Commonwealth with the DPU.

ing error underlying this proceeding was to provide the defendant with gas at less than the lawful rates approved by the DPU, the plaintiff would have us conclude that it is entitled to judgment as matter of law.

The plaintiff's contentions draw significant support in the relevant decisions of this Commonwealth. The Supreme Judicial Court has recognized on several occasions that rates set by public rate-making bodies have the force and effect of law and cannot be altered, whether by mistake, inadvertence, or even by voluntary agreement. In *New York, N.H., & H. R.R.* v. *York & Whitney Co.*, 215 Mass. 36 (1913), for example, the court held that the defendant was obligated to pay shipping rates established under the Interstate Commerce Act despite the carrier's error in failing to claim or collect the proper amount at delivery. Similarly, in *Papetti* v. *Alicandro*, 317 Mass. 382 (1944), it was held that a carrier subject to the regulation of the DPU under chapter 159B of the General Laws could, and indeed was obligated to, recover rebates which, although voluntarily paid to the shipper, resulted in the carrier's receiving less than the minimum lawful rates. Finally, in *Haverhill Gas Co.* v. *Findlen*, 357 Mass. 417 (1970), the court held that contract defenses were unavailable to a customer resisting the efforts of a gas company to recover for gas for which the customer had never been charged as a result of a billing error apparently identical to that committed by the plaintiff here. Noting the strong policies underlying the prohibition of G. L. c. 164, § 94, against discriminatory utility rates, the court stated that the case "was governed by the principles of public rate regulation and the binding effect of rates validly

---

Whenever the DPU receives notice of a proposed change in those rates amounting to a "general increase," it is obligated to "notify the attorney general of the same forthwith and . . . [to] thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes . . . ." The statute also provides that pending the effective date of such a change, "no different rate, price or charge shall be charged, received or collected by the company filing such a schedule from those specified in the schedule then in effect."

determined by a duly established public rate making authority." 357 Mass. at 421. It thus concluded that the customer's allegations of estoppel and illegality were simply immaterial. *Id.* at 424.

The defendant does not question the validity of the foregoing authorities. Indeed, in an apparent reaction to *Haverhill Gas Co.* and the line of cases upon which it is based, the defendant abandoned a number of affirmative defenses (namely estoppel, payment, and laches) initially raised in its answer. Nevertheless, the defendant would have us conclude that the policies and principles reiterated in *Haverhill Gas Co.* do not control its obligation to pay for gas supplied by a utility which has not complied with applicable provisions of the municipal finance laws. Because of the important interests underlying those provisions and the absence of any authority reconciling them with the apparently conflicting demands of utility rate enforcement under c. 164, we will examine each of the provisions relied upon by the defendant and will consider their application to the present facts.

1. The defendant first alleges that the plaintiff's failure to comply with St. 1890, c. 418, § 6, as amended through St. 1955, c. 60, § 1, and codified in the City of Boston Code (CBC) as St. 4, § 8 (1975), precludes it from enforcing its claim. In pertinent part, that provision, which we set out in the margin,[3] provides that all contracts in excess of $2,000

---

[3] "All contracts made by any department of the city of Boston or by any officer, board or official of the county of Suffolk having power to incur obligations on behalf of the county in cases where the obligations are to be paid for wholly from the treasury of the city, shall, when the amount involved is two thousand dollars, or more, or when the contract comes within section five be in writing; and no such contract shall be deemed to have been made or executed until the approval of the mayor of the city has been affixed thereto in writing and the auditor of the city has certified thereon that an appropriation is available therefor or has cited thereon the statute under authority of which the contract is being executed without an appropriation. All such contracts shall be accompanied by a suitable bond or deposit of money or other security for the faithful performance of such contracts, and such bonds or other security shall be deposited with the city auditor until the contract has been carried out in

entered into by a department of the city of Boston must be in writing and be approved by the mayor. "It is familiar law that one dealing with a city or town cannot recover if statutory requirements such as are contained in the defendant's charter have not been observed," *Richard D. Kimball Co.* v. *Medford*, 340 Mass. 727, 729 (1960), and noncompliance with the provisions of CBC St. 4, § 8, will bar claims brought by municipal contractors regardless of the benefits conferred on the city. *Adalian Bros.* v. *Boston*, 323 Mass. 629 (1949). *Urban Transport, Inc.* v. *Boston*, 373 Mass. 693 (1977). See also *Ryan* v. *Boston*, 204 Mass. 456 (1910); *Singarella* v. *Boston*, 342 Mass. 385 (1961). The plaintiff concedes that these requirements were not met here but argues that their application is not supported by the language or the policies underlying CBC St. 4, § 8.

We agree. At the very least, the defendant's reliance on CBC St. 4, § 8, presupposes the existence of a "contract." Although the relationship between the parties regarding the plaintiff's service at the jail may have some contractual qualities, it lacks many of the attributes of a typical contractual arrangement. In the first place, the plaintiff is the only source from which the defendant may procure gas in the Boston area. Further, once the decision is made to utilize the plaintiff's service the terms and conditions of that service are in large part dictated by the DPU and not by private agreement. As recognized in *Haverhill Gas Co.*, the nature and scope of such regulation may transform the underlying obligation to pay for utility services into a statutory one. There, the court quoted with approval its observation in *New York, N.H. & H. R.R.* v. *York & Whitney Co.*, 215 Mass. at 40 that "[t]he regulation by Congress of interstate commerce rates takes that subject out of the realm of ordinary contract in some respects, and places it upon the rigidity

all respects; and no such contract shall be altered except by a written agreement of the contractor, the sureties on his or their bond, and the officer, board or official making the contract, with the approval of the mayor affixed thereto."

of a quasi statutory enactment." 357 Mass. at 420. Indeed, the city has recognized the noncontractual nature of its relationship with regulated public utilities by its failure to require utilities to enter into written agreements since at least 1954 and by its treatment of these services as "non-order" accounts.[4] Hence, there is ample basis for concluding that the arrangement between the parties regarding the heating of the jail did not involve a contract as that term is used in CBC St. 4, § 8.

Moreover, the purpose of CBC St. 4, § 8, would not be furthered by construing it to bar the plaintiff's claim. It is settled that the policies underlying legislative enactments such as CBC St. 4, § 8, are "to limit the power of public officials in making contracts . . . so as to unify the control of the city's commercial transactions . . . and guard against waste by departments in the government [citations omitted]." *Urban Transport, Inc.* v. *Mayor of Boston*, 373 Mass. at 697. It is difficult to perceive how those policies would be furthered here, where the parties had no power to negotiate the crucial terms of their arrangement and where the defendant had no alternate source of gas. These factors demonstrate that, once the 1969 decision to convert the jail to gas heat had been made and that conversion accomplished,[5] there was no opportunity for the mayor "to exercise his 'practical wisdom in the administration of the affairs of the city.'" *Id.*, citing *McLean* v. *Mayor of Holyoke*, 216 Mass. 62, 64 (1913). Hence, the strong public interest in uniform utility rate enforcement, which was held in *Haverhill Gas Co.* to override conventional contract principles, supersedes the requirements of CBC St. 4, § 8.

2. The second provision of the CBC relied upon by the defendant is St. 1909, c. 486, § 16 (codified as CBC St. 4,

---

[4] See note 1, *supra*. We again note that, notwithstanding its position in this litigation, the city has clung to its apparently traditional policy of not requiring utilities to comply with the requirement of CBC St. 4, § 8.

[5] There is no indication in the record that any contract associated with that conversion was not made pursuant to all applicable provisions of the municipal finance laws.

§ 4 [1975]). That provision, which we set out in the margin,[6] prohibits expenditures by the defendant in excess of appropriations. Although CBC St. 4, § 4, does not specifically invalidate contracts which are in excess of appropriations, it is settled that the absence of an adequate appropriation ordinarily will have that effect. *Dyer* v. *Boston,* 272 Mass. 265 (1930). *Adalian Bros.* v. *Boston,* 323 Mass. at 630-631. *Central Tow Co.* v. *Boston,* 371 Mass. 341 (1976). As with its other argument, the defendant's invocation of the appropriation requirement necessitates that we resolve the apparent clash between the requirements of the municipal finance laws and the prohibition of G. L. c. 164, § 94, against discriminatory utility rates.

In large part, resolution of that conflict is dictated by the conclusions reached in part 1 of this decision. Like CBC St. 4, § 8, the policies recognized as underlying the appropriation requirements of § 4 include the centralized control over municipal finances, see *Flood* v. *Hodges,* 231 Mass. 252, 256 (1918), and the limiting of the power of municipal officials to enter into contracts. *Dyer* v. *Boston,* 272 Mass. at 274. Since, as previously discussed, those purposes would not be served here, we conclude that the absence of an adequate appropriation does not bar the plaintiff from recovering on its claim. In reaching this conclusion, we also note that the Supreme Judicial Court has declined to adhere rigidly to applicable appropriations requirements where, as here, local government spending is necessary to the attainment of overriding State interests. See, e.g. *Salisbury Water Supply Co.* v. *Salisbury,* 341 Mass. 42 (1960); *Lynn*

---

[6] "No official of the city, except in case of extreme emergency involving the health or safety of the people or their property, shall expend intentionally in any fiscal year any sum in excess of the appropriations duly made in accordance with law, nor involve the city in any contract for the future payment of money in excess of such appropriation, except as provided in section 6 of chapter 486 of the acts of 1909. Any official who shall violate the provisions of this section shall be punished by imprisonment for not more than one year, or by a fine of not more than one thousand dollars, or both."

*Redevelopment Authy.* v. *Lynn*, 360 Mass. 503, 506 (1971); *Board of Health of No. Adams* v. *Mayor of No. Adams*, 368 Mass. 554, 564-568 (1975); *Arlington* v. *Board of Conciliation & Arbitration*, 370 Mass. 769, 778-779 (1976).

*Judgment affirmed.*